IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

UNITED STATES OF AMERICA

:

:

: Criminal No. DKC 20-0038

:

JEROAM EDWIN NELSON, JR.,
et al.                          :

**MEMORANDUM OPINION**

Count one of the third superseding indictment charges eight
defendants with conspiracy to distribute and possess with intent
to distribute controlled substances from April to September 2019.
Individual defendants are charged in separate counts with
substantive offenses including possession with intent to
distribute controlled substances, possession of a firearm by a
prohibited person, possession of a firearm in furtherance of a
drug trafficking crime, and possession of body armor by a violent
felon. Many motions to suppress are pending, pertaining to wiretap
evidence, evidence recovered from searches pursuant to warrants
for location information, for various residences, and for
automobiles, and statements allegedly made. Other pending motions
seek disclosure, severance, and to adopt motions filed by other
defendants. After full briefing, a two-day motions hearing was
held on some of the pending motions. Argument on others was
deferred pending resolution of the first group.

## I.    Wiretaps-Background and Standards of Review

The investigation leading to the current charges was conducted by the Washington County Narcotics Task Force, beginning in March 2019, when a tip led them to a storage unit in Hagerstown, Maryland.  Law enforcement came to believe that Thamar J. Smith had rented the unit, that he was using it to store narcotics for distribution, and that he was supplying narcotics to Tyler and Edward Ware.  A covert motion-activated video camera captured Mr. Smith processing narcotics in the storage unit.  GPS on his vehicle led to the Ware brothers.  Then, beginning in June 2019, a state court judge authorized interception of four phones used by the Wares (TT1-TT4), which led to authorizations to intercept phones allegedly used by Jeroam Nelson (TT5, TT8, and TT10), Philander Spruill (TT6), and Jarvis Coleman-Fuller (TT9).  Defendants have moved to suppress the fruits of TT3, TT5, TT6, TT8, TT9, and TT10.[1]  They claim that the authorizations (1) were not supported by probable cause, (2) did not demonstrate necessity (that normal investigative procedures had been tried, or shown to be insufficient or too dangerous), (3) did not properly name one of

---

[1] At least one defendant has challenged each of these wiretap authorizations.  Not all defendants have standing to challenge all of them, however. A criminal defendant must be an "aggrieved person" to move to suppress under Title III, 18 U.S.C. § 2518(10)(a), defined as "a person who was a party to any intercepted wire, oral, or electronic communication or a person against whom the interception was directed," *id*. § 2510(11).

the defendants, and (4) failed to disclose a previous wiretap application. They also claim that (5) material misstatements or omissions were made in the applications, (6) the interceptions did not cease upon achieving the stated goals, or the goals were too broad, (7) minimization requirements were not observed, and (8) some of the recordings were not sealed timely.

The interceptions were authorized by Maryland judges. And, while Maryland and federal law are congruent in many ways, there are differences. It becomes necessary, then, to determine how admissibility is to be analyzed.

> Federal law governs the admissibility of evidence in federal criminal cases. *See, e.g., United States v. Glasco,* 917 F.2d 797, 799 (4th Cir. 1990). The Federal Wiretap Act contains a narrow exception to this general rule: under 18 U.S.C. § 2516(2),
>
>> The principal prosecuting attorney of any State or the principal prosecuting attorney of any political subdivision thereof [may apply] ... to a [State court] judge for, and such judge may grant in conformity with [18 U.S.C. § 2518] *and with the applicable State statute* [a wiretap order].
>
> 18 U.S.C. § 2516(2) (emphasis added). Under this provision, "when a state court authorizes a wiretap ... state wiretapping law should govern the admissibility of the wiretap evidence in federal court." *United States v. Bullock,* 2000 WL 84449, at *4 (4th Cir. Jan. 27, 2000); *see also Glasco,* 917 F.2d at 799.

*United States v. Harris*, 719 F.Supp.2d 616, 619 (D. Md. 2010).

The Maryland statute provides:

> (i)(1)  Any aggrieved person in any trial, hearing, or proceeding in or before any court, department, officer, agency, regulatory body, or other authority of this State or a political subdivision thereof, may move to suppress the contents of any intercepted wire, oral, or electronic communication, or evidence derived therefrom, on the grounds that:
>
> > (i)     The communication was unlawfully intercepted;
> >
> > (ii)    The order of authorization under which it was intercepted is insufficient on its face, **or was not obtained or issued in strict compliance with this subtitle**; or
> >
> > (iii)   The interception was not made in conformity with the order of authorization.

Md. Code Ann., Cts. & Jud. Proc. § 10-408 (West) (emphasis added).[2]

In the federal statute, each of the three is separate and distinct

---

[2] The federal counterpart is different in that it does not contain the second clause in subsection ii:

> (10)(a)  Any aggrieved person in any trial, hearing, or proceeding in or before any court, department, officer, agency, regulatory body, or other authority of the United States, a State, or a political subdivision thereof, may move to suppress the contents of any wire or oral communication intercepted pursuant to

from the others. *Dahda v. United States*, 138 S.Ct. 1491, 1499-1500 (2018). Maryland law divides the wiretap law into "preconditions" and "post conditions" and applies different standards for suppression:

> For the purpose of evaluating the validity of a wiretap order, this Court has established a dichotomy between preconditions and post conditions. *State v. Bailey,* 289 Md. 143, 152-54, 422 A.2d 1021 (1980). Preconditions include the actions that must be taken before a judge may issue an *ex parte* wiretap order and the inclusion of certain provisions required to be in the wiretap order. *Id.* at 153-54, 422 A.2d 1021. One such precondition is the requirement in § 10-408(e)(3) that "[e]very order and extension thereof shall contain a provision that the authorization to intercept ... shall be conducted in such a way as to minimize the interception of communications not otherwise subject to interception under this subtitle...." *See State v. Siegel,* 266 Md. 256, 273-74, 292 A.2d 86 (1972) (holding this requirement to be a precondition to obtaining intercept authority). With regard to preconditions, we said that the statute "sets up a strict procedure that *must* be followed and we will not abide any deviation, no matter how slight, from the prescribed path." *Id.* at 274, 292 A.2d 86 (emphasis in original). Failure of a

_____

> this chapter, or evidence derived therefrom, on the grounds that--
> (i) the communication was unlawfully intercepted;
> (ii) the order of authorization or approval under which it was intercepted is insufficient on its face; or
> (iii) the interception was not made in conformity with the order of authorization or approval.

18 U.S.C. § 2518 (10)(a).

precondition requires suppression of *all* the evidence obtained under the wiretap. *Id. See also* § 10-408(i)(1)(ii) (stating as a ground for suppression that "[t]he order of authorization under which [the communication] was intercepted ... was not obtained or issued in *strict compliance* with [the wiretapping statute]") (emphasis added).

Post conditions are the actions that must be taken after a valid wiretap order has been issued, including compliance with the minimization mandate in the order. *Bailey, supra,* 289 Md. at 153-54, 422 A.2d 1021. To post conditions, we apply a substantial compliance standard. *Id.* In the context of minimization, the substantial compliance standard is actually a reasonable compliance standard, which evaluates "the overall reasonableness of the totality of the conduct of the monitoring agents in light of the purpose of the wiretap and the information available to the agents at the time of interception." *Spease and Ross v. State,* 275 Md. 88, 99, 338 A.2d 284 (1975). Under this standard, imperfect compliance with a post condition does not require suppression of the evidence obtained pursuant to the wiretap order, so long as the level of compliance is reasonable under the circumstances. Furthermore, we have never decided what sanction we would apply if the monitoring agents were to fail to reasonably comply with the minimization mandate.

*State v. Mazzone*, 336 Md. 379, 383-84 (1994). The case that first recognized the dichotomy was *State v. Bailey*, 289 Md. 143, 153-54 (1980), where the defect was the failure of the wiretap order to contain a termination directive, as had been the case in *Siegel*. The *Siegel* order also failed to include directives that interception begin "as soon as practicable" and that interceptions

be minimized.  *Siegel*, 266 Md. at 272-73.  The *Bailey* court said that "the language is unequivocal, leaving no room to doubt that the legislature intended that the wiretap **order** conform scrupulously to the mandate of the statute." *Bailey*, 289 Md. at 152 (emphasis added.)  Here, the arguments go to the contents of the affidavits, and not to the orders themselves.

The parties discuss several Maryland cases from the Court of Special Appeals.  In *Poore v. State*, 39 Md.App. 44, 50-55 (1978), the alleged defect was the absence of a post-intercept **order** to delay notification.  Again, the problem was with an order, and not with an affidavit.  In any event, suppression was not required because it was not a "substantial departure."  It is correct that *Allen v. State*, 89 Md. App. 25 (1991), discussed strict compliance in the context of the exhaustion requirement and the requirement that the application contain a "full and complete statement of the facts and circumstances relied upon by the applicant . . . ."  The Court of Special Appeals found that the State had complied with those requirements so there was no cause to suppress.  Finally, *Salzman v. State*, 49 Md.App. 25 (1981), dealt with exhaustion of normal investigative procedures and disclosure of previous interceptions and discussed "strict compliance."  It did not find any violations, however.  In *Mazzone*, 336 Md. at 392-93, the Court of Appeals found that any error in the minimization **guidelines**, issued at the time the intercept order was signed, was part of the

7

judicial supervision of the wiretap and not subject to the strict compliance standard.    In sum, the focus of the Court of Appeals had been on asserted errors by the issuing judge in the contents of orders or guidelines.    The Court of Special Appeals has discussed strict compliance in other contexts but has not found suppression to be required.

The relevant standards follow.

### A.    Probable Cause

The probable cause standard for a wiretap order is the same as it is for a warrant.

> Pursuant to the provisions of the Maryland Code governing the issuance of wiretaps, the issuing court must find probable cause for belief that an individual is committing, has committed, or is continuing to commit a particular offense enumerated in § 10-406. *See* Md. Code Ann., Cts. & Jud. Proc. § 10-408(c). There furthermore must be probable cause for belief that particular communications concerning that offense will be obtained through the interception of communications over the targeted communication devices. *Id.* The standard of review governing affidavits in support of wiretap orders is identical to the standard governing the review of search warrants. *United States v. Talbert*, 706 F.2d 464 (4th Cir. 1983).  A reviewing court is not to substitute its judgment for probable cause but need only determine whether there was a substantial basis for the issuing court's determination of probable cause. *Illinois v. Gates*, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983).

*Galloway v. United States*, No. 10-cr-775-RDB, 2018 WL 1326399, at *5 (D.Md. Mar. 15, 2018).

B.    **Necessity**

Both federal and Maryland law require a finding regarding normal investigative procedures.  These provisions are "designed to ensure that the relatively intrusive device of wiretapping is neither 'routinely employed as the initial step in criminal investigation,' *United States v. Giordano*, 416 U.S. 505, 515 (1974), nor 'resorted to in situations where traditional investigative techniques would suffice to expose the crime.' *United States v. Kahn*, 415 U.S. 143, 153 n. 12 (1974)." *United States v. Smith*, 31 F.3d 1294, 1297 (4th Cir. 1994).  In this regard:

> The government's burden in alleging sufficient facts to show the need for wiretaps "is not great." *United States v. Smith*, 31 F.3d 1294, 1297 (4th Cir. 1994). Although the government cannot satisfy its burden with mere conclusory statements or a recitation of certain difficulties in collecting evidence "it need only present specific factual information sufficient to establish that it has encountered difficulties in penetrating [the] criminal enterprise or in gathering evidence— to the point where ... wiretapping becomes reasonable." *Id.* at 1297-98 (alterations in original) (internal quotation marks and citations omitted).

*Galloway*, 2018 WL 1326399, at *5.  Moreover,

> In many other cases, we have affirmed wiretaps intended to reveal the higher levels of a conspiracy when ordinary investigative methods could not reach them. *See, e.g.,* *United States v. Galloway*, 749 F.3d 238, 242-43 (4th Cir. 2014); *Smith*, 31 F.3d at 1297-98; *United States v. Leavis*, 853 F.2d 215, 222 (4th

Cir. 1988); *United States v. Clerkley*, 556
F.2d 709, 714–15 (4th Cir. 1977).

*United States v. Davis*, 782 F.App'x 246, 251 (4th Cir. 2019).

### C.  **Franks v. Delaware**

Believing it was – or would have been – fairly easy to discover their criminal behavior without resorting to wiretaps, Defendants contend that the affiant either misstated applicable "facts" regarding other investigative procedures or omitted material "facts" in that regard.  The so-called facts were whether other procedures, such as physical surveillance, could or would bear fruit.  They argue based only on their own assessment and provide no affidavit or other offer of proof.

> To demonstrate that a *Franks* hearing is
> warranted, "the accused must make a
> substantial preliminary showing that false
> statements were either knowingly or recklessly
> included in an affidavit supporting a search
> warrant and that, without those false
> statements, the affidavit cannot support a
> probable cause finding." *United States v.
> Allen*, 631 F.3d 164, 171 (4th Cir. 2011)
> (emphasis in original).

*United States v. Seigler*, 990 F.3d 331, 344 (4th Cir. 2021), *cert. denied*, 142 S. Ct. 336 (2021).  Moreover, the alleged misstatements must be as to facts, rather than opinions.  *See, e.g., United States v. Gordon*, 871 F.3d 35, 51 (1st Cir. 2017).

### D.  **Identification**

A wiretap application must include "the identity of the person, if known, committing the offense and whose communications

are to be intercepted." Md. Cts. & Jud. Proc § 10-408(a)(1)(ii)(4);
18 U.S.C. § 2518(1)(b)(iv). The Supreme Court has held that "Title
III requires the naming of a person in the application or
interception order only when the law enforcement authorities have
probable cause to believe that that individual is 'committing the
offense' for which the wiretap is sought." *Kahn*, 415 U.S. at 155.

### E.   Notice

A wiretap application must contain a "full and complete
statement of the facts concerning all previous applications known
to the individual authorizing and making the application, made to
any judge for authorization to intercept wire, oral, or electronic
communications involving any of the same persons, facilities or
places specified in the application, and the action taken by the
judge on each application." Md. Cts. & Jud. Proc. § 10-
408(a)(1)(v); 18 U.S.C. § 2518(1)(e).

### F.   Minimization

Every interception must be conducted so as to "minimize" the
"interception of communications not otherwise subject to
interception . . . and must terminate upon the attainment of the
authorized objective . . ." 18 U.S.C. § 2518(5). All of the
applications in this case provided instructions and procedures for
minimization.

> The statute does not require that all innocent
> communications be left untouched. Rather, it
> simply requires that unnecessary intrusions be

> minimized or reduced to the smallest degree
> possible. [*United States v.*] *Clerkley*, 556
> F.2d [709, 716 (4th Cir. 1977)]. In determining
> whether the minimization requirements of
> section 2518(5) have been met, the courts
> apply a standard of reasonableness on a case-
> by-case basis. *Id.*

*United States v. Bautista*, 972 F.2d 342 (table), 1992 WL 172667, at *4 (4th Cir. 1992). As pointed out by Judge Hollander, "[in] the course of interception, it is difficult to know in advance which conversations ultimately might be 'irrelevant and should have been terminated.' *United States v. LaGorga*, 336 F.Supp. 190, 196 (W.D.Pa. 1971). This is why minimization cannot be judged by hindsight." *United States v. Miller*, 50 F.Supp.3d 717, 726 (D.Md. 2014).

Although Defendants purported to raise an argument concerning minimization in their motions, there are no specifics presented and no argument was made at the hearing. The formalities for minimization were included in the applications (and presumably the orders) and, in the absence of any argument, much less evidence, that the instructions and protocols were not followed, the minimization requirement provides no basis on which to suppress any evidence.

**G.    Failure to Cease Interceptions when Objective Obtained**

Under Federal law, "(5) No order entered under this section may authorize or approve the interception of any wire, oral, or electronic communication for any period longer than is necessary

12

to achieve the objective of the authorization, nor in any event longer than thirty days." 18 U.S.C. § 2518.  Furthermore, the order shall require that it "terminate upon attainment of the authorized objective, or in any event in thirty days."  There is no argument that the orders failed to comply with those directives.  Rather, Defendants contend that the objectives were too broad, and could never be achieved, or were in fact achieved but the wiretaps continued.

### H.   Sealing

Both wiretap statutes provide that "Immediately upon the expiration of the period of the [wiretap] order, or extensions thereof, [wiretap] recordings shall be made available to the judge issuing such order and sealed under his directions." Md. Cts. & Jud. Proc. § 10-408(g)(l); 18 U.S.C. § 2518(8)(a). "The presence of the seal provided for by this subsection, or a satisfactory explanation for the absence thereof, shall be a prerequisite for the use or disclosure of the contents of any wire, oral, or electronic communication or evidence derived therefrom under subsection (3) of section 2517."  18 U.S.C. § 2518(8)(a).  The satisfactory explanation applies to a delay in sealing as well as to the absence of a seal.  *United State v. Ojeda Rios*, 495 U.S. 257, 264 (1990).

> The primary thrust of § 2518(8)(a), see S.Rep. No. 1097, 90th Cong., 2d Sess., 105 (1968), and a congressional purpose embodied in Title

> III in general, *see, e.g., United States v.*
> *Giordano*, 416 U.S. 505, 515, 94 S.Ct. 1820,
> 1826, 40 L.Ed.2d 341 (1974), is to ensure the
> reliability and integrity of evidence obtained
> by means of electronic surveillance. The
> presence or absence of a seal does not in
> itself establish the integrity of electronic
> surveillance tapes. Rather, the seal is a
> means of ensuring that subsequent to its
> placement on a tape, the Government has no
> opportunity to tamper with, alter, or edit the
> conversations that have been recorded. It is
> clear to us that Congress viewed the sealing
> requirement as important precisely because it
> limits the Government's opportunity to alter
> the recordings.

*Ojeda Rios*, 495 U.S. at 263.   An explanation must have been objectively reasonable at the time and the evidence must be presented at the trial level, and not just on appeal.  *Id*. at 267-68.

Maryland law, while calling for immediate sealing, treats that requirement as a "post condition," requiring proof of prejudice and lack of substantial compliance to result in suppression.  *See, Allen v. State*, 89 Md. App. 25, 33-34 and 37 (1991).

With those standards in mind, the wiretap applications can be examined individually.

## II.  Discussion and Analysis

### A.    TT1 and TT2-Tyler Ware

There is no direct challenge to the first two wiretaps, aimed at Tyler Ware and authorized on June 6 and June 13.  Likely, none

of the moving defendants has standing to contest those intercepts. Those affidavits have not been provided to the court although some of the intercepted conversations and text messages are described in affidavits for later wiretaps.

### B.    TT3-Edward Ware, Issued June 20, 2019, by Judge Mark K. Boyer.[3]

Mr. Nelson, joined by others, argues that probable cause was lacking for the phone allegedly used by Edward Ware, whom the authorities identified as the main source for his brother Tyler. He argues that "relatively little of the 121-page wiretap application actually relates to Edward Ware or his suspected activities" and that "the factual basis offered to intercept TT3 consists of a single two-month-old sighting of Edward Ware getting into Thamar Smith's car, a dozen phone and text conversations between the Ware brothers, Edward Ware's contact with two drug users and a suspected drug dealer, the bare assertions of two confidential informants that Edward Ware sold drugs, and two anonymous tips from February and April 2019 mentioning him."

In contrast, the Government contends that the affidavit detailed a several month long investigation into the drug trafficking activities of the Wares, outlined their criminal histories including a number of prior drug convictions, described

---

[3]    TT4 was also authorized on June 20. Intercepted conversations over TT4 are referenced in later affidavits, although no current defendant challenges TT4 directly.

multiple anonymous tips to law enforcement by concerned citizens, provided information about Eddie Ware's involvement in drug trafficking from four reliable confidential sources, explained how one of these confidential sources had recently completed two controlled purchases of heroin/fentanyl from Tyler Ware.

In reply, Mr. Nelson takes issue with the Government's characterization of the information, pointing out that two of the tips were several years earlier, the confidential sources provided general information, not clearly based on personal knowledge, and that only three of them had information regarding Edward Ware. He concludes that "the anonymous and confidential sources' information should not materially bear upon the probable cause analysis." (ECF No. 314, at 9).

Defendant's argument relies on a too narrow and hyper-critical view of the information and requires a subjective credibility assessment that is the province of the issuing judge. A reviewing court, rather, is to determine whether the issuing judge had a substantial basis for concluding that probable cause was shown. That review is based on the totality of circumstances and does not require parsing out information so that it can be evaluated in isolation from other information. Thus, it is not irrelevant that some information specifically referred to Tyler Ware, Edward Ware's twin brother, or to Thamar Smith.

It is correct that the most concrete information concerning Edward Ware is that, on April 17, 2019, he was seen with Thamar Smith under circumstances that led law enforcement to conclude that Smith had sold Edward controlled substances. (ECF No. 311-1, at 39.)  That is hardly the only circumstantial evidence supporting the conclusion that he was involved in the drug distribution conspiracy.  Conversations and text messages between the Wares intercepted on phones used by Tyler Ware concerned drugs, and his phones were in frequent contact with others also believed to be involved in illegal usage of CDS.

The argument concerning exhaustion of normal techniques is similarly based on a crabbed view of the relevant considerations. Sought on June 20, 2019, the affidavit recounted the course of the investigation beginning in mid-March.  The initial investigation focusing on Thamar Smith, surveillance of the storage facility, and the tracking of his vehicle, led the authorities to the Ware brothers, who were each observed in contact with Mr. Smith.  By mid-May, agents had developed information from confidential sources, checked trash bags and containers, attempted physical surveillance, continued to monitor the GPS on Mr. Smith's vehicle, checked wage data for some of the suspected associates, and reviewed "historical recording data from [a] covert surveillance recording device."

TT1, a line used by Tyler Ware, was monitored from June 6 to June 9, when he stopped using it.  Interception of communications over TT2, another line used by Tyler Ware, was authorized on June 13.  Law enforcement thought the Ware brothers were working together, but each was in charge of his "own separate local DTO." They thought that Edward Ware was supplying Tyler Ware, and that Thamar Smith was the source of supply.  The affiant analyzed telephone records of proposed TT3.  (On page 95, the affidavit begins discussing TT4, also used by Edward Ware.)

In the section entitled "Exhaustion of Alternative Investigative Methods and Need for Wire and Electronic Intercept," the affiant listed and discussed several techniques, describing what success the technique had achieved, but noting the limitations for further development.  In particular, the affiant noted the "close-knit" nature of the organization, the familiarity of the targets with agents and their law enforcement vehicles, and the geography and buildings in certain areas, which all made surveillance, introduction of undercover officers, or controlled purchases difficult or unlikely to bear fruit.  Other techniques were described as premature or likely to thwart the investigation. Specific information was provided as to the danger or unlikelihood of producing evidence for some techniques as well as why others were not available.

Mr. Nelson complains that the agents did not attempt "surveillance, confidential source interviews, or controlled buys to investigate Edward Ware before seeking to wiretap his phone conversations." Specifically, he contends that they cut off surveillance in April 2019 before they should have, and disregarded other "obvious" investigative opportunities, such as surveillance around Pangborn Boulevard, and even "misleadingly" said that they did not know where his residence or stash house were located. According to Mr. Nelson, they should have tried to learn more about him from informants.

Mr. Nelson ignores the particularized information about the characteristics of this conspiracy, including its insularity and familiarity with local law enforcement. This is more than mere conclusory language and adequately shows why the "normal" techniques were insufficient to reveal the full scope of the conspiracy.

### C.    TT5-Unknown Black Male, Issued June 28, 2019, by Judge Mark K. Boyer

Mr. Nelson challenges the probable cause determination because it was based primarily on intercepted conversations between TT5 and TT3 (used by Edward Ware). The affidavit reveals no direct contact between Thamar Smith and the user of TT5, or between TT5 and Tyler Ware. Thus, Mr. Nelson contends that the recitation of the larger investigation was irrelevant. Moreover,

he claims that there were only limited conversations over two days in June 2019 which were not explicitly drug related. He acknowledges that the affidavit recounts one instance of video surveillance, showing Edward Ware around Tyler's residence, walking up to a Jeep. The toll analysis is said to be "sparse." He concludes:

> Thus, the factual basis offered to intercept TT5 is markedly less than that of TT3, which is deficient in its own right, and consists of minimal communications over two days and TT5's mere association with people who were not implicated in the investigation at the time of the application. If a person's mere association with a suspect at a crime scene does not create probable cause to search them, then a person's mere association with people who have nothing to do with an investigation certainly cannot do so. *See, e.g., Ybarra v. Illinois,* 444 U.S. 85, 91 (1979) ("Where the standard is probable cause, a search or seizure of a person must be supported by probable cause particularized with respect to that person.").

As the Government recounts, the TT5 affidavit began with a summary of the investigation beginning with Thamar Smith and the Ware brothers, and then the conversations between the Wares and others over TT1, TT2, TT3, and TT4. Specifically, the affidavit contained transcripts and descriptions of "numerous" purportedly drug-related conversations between Eddie Ware, using TT3, and the user of TT5 (who, at that time, was unknown, but who was later identified as Jeroam Nelson).

Mr. Nelson posits that "interim" efforts should have been attempted, including real-time surveillance of Edward Ware, obtaining subscriber information and toll records for the telephone number given to Enterprise, surveillance of the address given to Enterprise, and checking law enforcement and wage databases for Jeroam Nelson.

Again, the defense argument is based on a too stringent view of the necessity requirement. Judge Hollander's discussion of the requirement in *Miller*, 50 F.Supp.3d at 727-28, catalogues the considerations that apply. Among them are that other investigatory techniques need not be shown to be wholly unsuccessful or that all possible alternatives have been exhausted, and that issuing judges may rely on the knowledge, training, and experience of the affiant. Like in *Miller*, the issuing judge determined that the exhaustion had been shown, and there is no basis to disagree with that conclusion.

Mr. Nelson also contends that the failure to name him in the application renders it illegal and requires suppression of the interceptions obtained by TT5 and well as the following ones, TT8, TT9, and TT10.  The application stated that investigators had been unable to make a positive identification of the user of TT5. The affidavit explained that the subscriber information listed the user as "Nelson Me" at an address in Kansas, and that investigators had surveilled the user in a black Jeep Cherokee that was rented

21

by Jeroam Nelson at an address in Hagerstown.  Given the history of the investigation, it was not unreasonable for the investigators to resist leaping to the conclusion that the person using that phone was Jeroam Nelson.  Subscriber information for other phones were in fictitious names (e.g., TT3 in name of Adam Jones, used by Edward Ware), and Thamar Smith used a fake driver's license in the name of Michael Silver.  In the application, the affiant recited that the "unknown Black Male" had been operating different vehicles rented in someone else's name.  (ECF No. 311-2, at 116).  He also stated that he knows that "distributors of CDS often subscribe to telephones in fictitious names."  (ECF No. 311-2, at 118).  The application and affidavit correctly included all the information developed.  The failure to name Mr. Nelson does not require suppression.[4]

### D.   TT6-Unknown Male #2, issued June 28, 2019, by Judge Mark K. Boyer, and continuation issued on July 26 (Philander Spruill).

This wiretap, sought on the same day as TT5, is challenged by Mr. Spruill (ECF Nos. 106, 109 and 268) and Mr. Benton (who adopted ECF No. 260, filed by Mr. Delaney, ECF Nos. 277, 309).

Mr. Benton's motion (ECF No. 260) asserts that TT6 should be suppressed because it failed to identify Mr. Spruill, erroneously

---

[4] Mr. Nelson stopped using TT5 on June 30, and, the Government contends, switched to TT8.

referred to TT5 concerning necessity[5], and, moreover, because the affidavit failed to acknowledge that Mr. Spruill's identity was known and failed to demonstrate necessity.  He argues that law enforcement had indeed identified Mr. Spruill as the user of TT6 and "knew" that he lived at 746 Spruce Street before seeking the wiretap.

Mr. Spruill does not contend expressly that probable cause is lacking, even though he points out that the bulk of the affidavit does not even mention him or his telephone.  He notes that it is not until page 97 that there is mention of the "unknown Male #2" or the phone that is TT6. A communication between TT3 (Edward Ware) and TT6 occurs the day after TT3 is authorized, June 21.  He does argue that the exhaustion section is but a "rehash" of previous applications, that it was not possible that the residence of the "unknown Male #2" was not known, that no attempt was made to surveil him, and that there is no investigative activity after June 26.

This affidavit, like its predecessors, contains sufficient foundation for the finding of probable cause, including text messages, intercepted calls, surveillance, and analysis of toll

---

[5] TT5 and TT6 were sought on the same afternoon, and the affidavits were signed only a few minutes apart.  TT6 contains several obvious typographical errors referring to TT5 (or TT4) when TT6 should have been referenced.  While not to be encouraged, these errors do not require suppression as they could not have misled the issuing judge.

records.   The exhaustion requirement was also supported.   Sought
at the same time as TT5, this affidavit reported that the
intercepts over TT1-4 revealed planned meetings but that the
meetings occurred out of view of physical surveillance, and that,
while "unknown male #2" has been seen meeting with Edward Ware,
his identity and residence and/or stash house remained unknown.
Continued surveillance, in conjunction with interceptions, would
continue.

Mr. Spruill, as does Mr. Benton, argues that he should have
been named in the application and points to the subsequent
application for a tracking device on his phone.   The application
was signed and issued on July 2, 2019, but contains a "reviewed
by" notation apparently dated June 26.   On page 4, the affiant
noted that he believed that Philander Spruill is "unknown male
#2."   The email address on the prepaid wireless account is
budda2360@icloud.com, and Mr. Spruill was known to have the street
name Budda.   This is too weak a reed on which to base a failure to
name argument.   The tracking warrant was not sought until July 2
and the reviewed by notation does not establish that all of the
contents were known by June 26.

The affidavit for TT6 contains the information that law
enforcement observed a Blue Chrysler registered to Mr. Spruill at
a location surveilled based on interceptions between Tyler Ware
and the unknown mail using TT6.   They identify the Chrysler as

24

belonging to the unknown male.  They recite that the residence of the unknown male is not known and that attempts to identify him have been unsuccessful even though he has been observed.  The affidavit states that he has been seen operating different rental vehicles on more than one occasion and that he was using a rental vehicle that was rented in someone else's name.  The subscriber information for TT6 comes back to a prepaid customer with an address in Georgia.  Suppression is not warranted due to the failure to name Mr. Spruill.

With regard to the continuation, Mr. Spruill argues that necessity wasn't shown, and that, by that time, the goals of the investigation had been met and interceptions should have ceased.

The Government responds that the recitations of other investigative techniques were not mere repetitions, but rather provided updates.  Moreover, it argues that the same explanations remained applicable and thus were properly included in this affidavit.

The purpose of defining the goals of a wiretap is to enable the issuing and monitoring judge to assess the necessity for and progress of the investigation.  *United States v. Rose*, No. 19 Cr. 789 (PGG), 2021 WL 2117119, *6 (S.D.N.Y. May 24, 2021).  When the crime under investigation is a conspiracy, significant leeway is permitted in defining the goals:

First, defendant contends that the goals of the wiretaps were "so broad that [they] could never be met," therefore rendering 18 U.S.C. § 2518 "a nullity." According to defendant, "[t]he electronic surveillance authorized through 1995 had met its realistic investigative goals," and after January 1, 1996, the government was "manufacturing requisite necessity" by stating that investigative goals had not been met.

In the 1996 wiretap applications, the government stated that, among other things, it expected that the intercepted wire communications would concern "the identification of other co-conspirators, and aiders and abettors who are acting in concert with the subjects of this application, including the identity of currently unidentified sources of heroin, and individuals involved in the planning and commission of interstate computer robberies." *See, e.g.,* N.D. Cal. Jan. 19, 1996 Appl. at 14943:15-19; E.D. Cal. Jan. 19, 1996 Appl. at 15057:20-25; N.D. Cal. Jan. 30, 1996 Appl. at 15166:12-16; N.D. Cal. Feb. 16, 1996 Appl. at 15364:9-13. While defendant is correct that many of the members of the Luong organization had been identified by the end of 1995, it does not follow that the government s goal of identifying remaining members of the conspiracy was overbroad or amounts to "manufacturing" necessity.

An order authorizing electronic surveillance "'must be broad enough to allow interception of any statements concerning a specified pattern of crime.'" *Licavoli,* 604 F.2d at 620 (quoting *United States v. Tortorello,* 480 F.2d 764, 780 (2ᵈ Cir. 1973)). Moreover, as the Ninth Circuit has recognized, "[b]ecause the government has a duty to extirpate conspiracy beyond its duty to prevent the mere commission of specific substantive offenses . . . the government is entitled to more leeway in its investigative

methods when it pursues a conspiracy."
*McGuire,* 307 F.3d at 1198.

The mere fact that some of the main
conspirators have been identified does not bar
the government from using electronic
surveillance to identify remaining members of
the conspiracy. *Cf. United States v. Torres,*
908 F.2d 1417, 1422 (9th Cir. 1990) ("We have
consistently upheld findings of necessity
where traditional investigative techniques
lead only to apprehension and prosecution of
the main conspirators, but not to apprehension
and prosecution of suppliers, major buyers or
other satellite conspirators."); *Sandoval,*
550 F.2d at 430 (stating that "[r]equiring the
officers to halt their investigation when they
obtained evidence to prosecute only [the main
conspirator and his wife] would have
frustrated" the objective of apprehending
satellite conspirators).

In light of the government's duty to
eradicate conspiracies, the government s goal
of further identifying members of the Luong
organization through the use of wiretaps in
1996, while broad, was not impermissible. *See
McGuire,* 307 F.3d at 1198 (stating that the
conclusion that the government has more leeway
in investigating conspiracies "reflects a
larger principle of proportionality embodied
in the wiretapping statute: The more grave the
threat posed to our society, the greater the
government's leeway in pursuing it."); *see
also Sandoval,* 550 F.2d at 431 (noting that
"the affidavit, while broad in the sense of
the numbers suspected, is narrowly limited to
the [the main conspirator] and his underlings
and to the one alleged conspiracy").

*United States v. Ai Le,* 255 F.Supp.2d 1132, 1137–38 (E.D.Cal. 2003)

(footnote omitted). It is not unusual in drug conspiracy

investigations to define those goals in terms of learning the

identity, location, and method of everyone involved. See, *United States v. Gordon*, 871 F.3d 35, 51-52 (1st Cir. 2017).

The continuation affidavit, executed on July 26, identified Mr. Spruill as the user of TT6 with the nickname Buddha and a leader of the DTO. It recited that his source of supply in Baltimore County was still unknown. The affiant noted that intercepted communications have indicated that meetings were to take place throughout the tristate area. At that point, though, "agents have not been able to positively identify the location of/or person of the Source of Supply believed to be located in Baltimore County, Maryland." It was feared that DTO "leaders", presumably including Mr. Spruill, may or may not have direct contact with their source of supply and associates may conduct the transactions, and meetings might occur in public or in private, such as in restrooms. Accordingly, while they intended to continue to use surveillance, particularly in conjunction with authorized interceptions, surveillance would not fully meet the goals of the investigation. Covert electronic surveillance devices were used, but had not revealed his source of supply. A GPS tracking device was installed on his car (and one used by Mr. Benton). Again, while useful, particularly in conjunction with authorized interceptions, the tracking information was not likely to achieve the full goals and objectives. This explanation was more than sufficient to satisfy the "necessity" prong.

Arguments by the targets of surveillance that the authorities had achieved their objectives also ring hollow.  Obviously, the investigation was progressing, but more remained to be pursued.

### E.    TT8-Jeroam Nelson. Issued August 9, 2019, by Judge Mark K. Boyer

Mr. Nelson challenges the probable cause showing by pointing out that it was wrong to characterize him as an associate of Tyler Ware, that there was no information linking him to either brother and that information from the TT5 intercept was stale.[6]  He also contends that there was no probable cause to establish that the phone number belonged to or was used by him, the common call comparison and single tip being insufficient.

The Government, in contrast, highlights the calls on TT8, immediately after its activation when Mr. Nelson stopped using TT5, to drug associates who had been in contact over TT5 immediately beforehand.    It argues that the tip from the confidential source was corroborative.  It also contends that the passage of five weeks does not make the information stale and that the switching of phone numbers along with continued communication with suspected co-conspirators and customers indicates continuing distribution.

---

[6] Conversations over TT5 were intercepted only from June 28 to 30.

The Government correctly argues that there was probable cause to authorize interception of TT8. While the substance of the calls on TT5 more than a month earlier is important to that determination, there was also ample evidence that the drug distribution was continuing and that TT8 was being used for that purpose. The pattern established in earlier intercepts continued, corroborated by the tip. The totality of circumstances provided ample basis.

The missed "interim" efforts for this wiretap allegedly included more real time surveillance, checking Mr. Nelson's probation records, investigating other subjects intercepted over earlier wiretaps, further use of confidential sources, checking phone records and CSLI, and GPS tracking of rental cars. Again, this argument applies an inappropriate standard. The issuing judge had sufficient basis on which to conclude that exhaustion had been shown.

TT8 did not include TT6 in the list of "all previous applications known to the individual authorizing and making the application, made to any judge for authorization to intercept wire, oral, or electronic communications involving any of the same persons, facilities or places specified in the application, and the action taken by the judge on each application." TT6 was aimed at "Unknown Black Male #2" who turned out to be identified as Philander Alexander Spruill, and not Nelson. The only specified

overlap in the two concerned the Ware brothers, who the Government proffers were not intercepted over TT8, TT9, or TT10, as it turned out.  The same judge who authorized TT6 was considering TT8.  The Government contends that the omission was "a simple oversight of absolutely no consequence."  The defense sees it as a fatal omission, particularly under Maryland law.  The Court of Special Appeals, in *Salzman*, 49 Md. App. at 37-38, discussed the disclosure requirements under Maryland law, and emphasized that only prior applications "known to the individual" applicant need be included involving the same persons.

18 U.S.C. § 2518(1)(e) requires an application to include "a full and complete statement of the facts concerning all previous applications known to the individual . . . making the application, made to any judge for authorization to intercept . . . wire . . . communications involving any of the same persons, . . . and the action taken by the judge on each such application[.]"  The purpose of this section has been discussed, but not definitively resolved:

> The legislative history of Title III does not amplify the meaning of this statutory section, but in *United States v. Bellosi*, 163 U.S.App.D.C. 273, 276, 501 F.2d 833, 836 (1974), the court concluded that the legislative intent was "strictly to limit the employment of those techniques of acquiring information * * * to conform with the commands of the Fourth Amendment * * *." In that case the court discerned a number of objectives that could be served by section 2518(1)(e), among them being the prevention of judge-shopping; providing the judge to which

> application is made with detailed information
> appropriate to judicial consideration of
> whether the proposed intrusion on privacy is
> justified; and to reveal to the judge whether
> past applications have been denied in order to
> forestall Government harassment or other
> abuses of the statutory procedure. We accepted
> *Bellosi's* analysis of the statutory objectives
> in *United States v. Bernstein*, 509 F.2d 996 (4
> Cir. 1975), *vacated and remanded on other
> grounds,* 430 U.S. 902, 97 S.Ct. 1167, 51
> L.Ed.2d 578 (1977), and in our opinion
> Congress never intended that section
> 2518(1)(e) should be construed to require
> successive applications as a precondition to
> an appeal.

*Application of U.S.,* 563 F.2d 637, 641–42 (4th Cir. 1977).

As noted above, only the Wares were identified as potential participants in conversations to be overheard in both TT6 and TT8. As noted throughout, the Ware brothers were using the phones in TT1 (briefly), TT2, TT3, and TT4.  If they were to be intercepted on TT6, they would using their own phones that had already been subject to intercepts that were listed in the new application. The wiretap laws require identification of all persons expected to be intercepted, regardless of whether they will be using the phone line that is the subject of the intercept or on the other end:

> We therefore conclude that a wiretap
> application must name an individual if the
> Government has probable cause to believe that
> the individual is engaged in the criminal
> activity under investigation and expects to
> intercept the individual's conversations over
> the target telephone.

*United States v. Donovan*, 429 U.S. 413, 428, (1977). By referencing the earlier intercepts on the Ware brothers' phones, the issuing judge was advised of the previous intercepts and including TT6 would have been superfluous as to the Wares. TT8 was essentially a continuation of TT5 which had been used by Mr. Nelson. TT5 was issued on the same day as TT6, so it is easy to see why the affiant did not see that TT6 was not pertinent to TT8.

Mr. Nelson was not named in TT6 (he couldn't have been because he had not yet been identified) and, while he has standing to challenge TT8, it is not logical that he should be able to complain about the omission of a reference to another intercept that did not involve him. Clearly TT6 was "known" to the applicant, but it has not been shown that he knew that TT6 should have been included but he chose deliberately to omit it. At most, it was an innocent mistake and could not have misled the issuing judge.

**F.    TT9-Jarvis Coleman-Fuller, Issued August 14, by Judge Daniel P. Dwyer**

Defendants make a similar staleness argument for TT9, which relied on interceptions over TT5 between Mr. Nelson and Mr. Coleman-Fuller in late June. They also claim that the interceptions are "unpersuasive" regarding Mr. Coleman-Fuller's role and whether drug related conversations would be overheard.

The Government sees it quite differently, calling this application "textbook." It points out that the affidavit described

a controlled purchase from Mr. Coleman-Fuller the second week of August, preceded by text messages.  It also refers to the toll analysis.

Again, the Government has the better analysis.  Mr. Coleman-Fuller somewhat inconsistently challenges information about CS3, either as it relates to probable cause or as part of the *Franks* challenge, but then says CS3 should have been used further before resorting to the wiretap.  He says we don't know whether CS3 is using drugs or requesting payment, making his reliability unproven.  Those details would not have changed the equation.  CS3 was used for a monitored, but not recorded, controlled buy, and had no other involvement or information.

Regarding necessity, in addition to the earlier mentioned possible "interim" efforts, Defendants fault the law enforcement failure to make use of information provided to Enterprise and to undertake surveillance of Mr. Coleman-Fuller using information from a confidential source.  He contends that proceeding to TT9 was premature.  The affidavit revealed the limited role that CS3 had and could play in the investigation.  CS3 is described as not being a member of the DTO and knowing only that he sold CDS in a specific area, but not knowing the details of Coleman-Fuller's role or his source of supply.  The issuing judge was also told that Mr. Coleman-Fuller used rental vehicles, and changed vehicles frequently, and that they had been unable to locate his residence

34

or stash house through surveillance. The information was sufficient.

A part of Coleman-Fuller's *Franks* challenge rests on the contention that he was erroneously portrayed as the source of drugs leading to an overdose by incorporating a misleading chart of chats. As noted by the Government, it does not appear that anything is omitted and that the affiant states that Martin obtained drugs from someone else and no longer needed Coleman-fuller to bring any. There certainly was nothing material omitted. He also points to the typographical errors, but those also are immaterial.

### G. TT10-Jeroam Nelson, issued August 20 by Judge Mark K. Boyer

Mr. Nelson's argument regarding this, final, intercept is unclear. As noted by the Government, the application referred to many drug related conversations involving Mr. Nelson intercepted over TT8 and TT9 and the search at the home of Eric Johnson resulting in the search of his phone containing communications with Mr. Nelson. Immediately after using TT8 to text another person, Mr. Nelson stopped using TT8 and began using TT10. Investigators were still intercepting TT9 and overheard calls between Mr. Coleman-Fuller and Mr. Nelson on TT10 that law enforcement believed to be drug related. The basis for probable cause was ample. Regarding necessity, Mr. Nelson says the section

was an "exact replica" of TT9 with one difference, law enforcement believed he frequented several different addresses, but hadn't identified them positively yet.

The allegedly missed interim efforts here are more real-time surveillance of the targets and warrants for phone records and CSLI.  TT10 was sought only 6 days after TT9 and was necessitated because Mr. Nelson stopped using TT8 after the search at Mr. Johnson's residence.   The affidavit outlined what normal investigative techniques had been used or tried, and why the wiretap was justified.

### H.    Franks v. Delaware

Given the facial validity of the wiretap orders, it is necessary to address Defendants' request for a hearing pursuant to *Franks v. Delaware* so that they can try to establish that "facts" were either misstated or omitted such that the issuing judges would have declined to issue the orders had the "facts" been properly presented.  The so-called "facts" about which Defendants complain relate to the availability of other, less intrusive, investigative techniques.  As noted before, the burden on law enforcement to justify a wiretap is not great and is designed to show that other techniques would not suffice to uncover the crime.  Defendants complain that law enforcement was too quick to seek wiretaps and, perversely, seem to contend that their involvement was so obvious that it could have been uncovered by more surveillance or other

less intrusive procedures.  They argue, however, based only on what is in the affidavits and do not supply any outside evidence, expert or otherwise, to show precisely what could have been done so easily or with guaranteed results.

For TT3, they assert that the affidavit omitted the ability to track Edward Ware via CSLI, to surveil Pangborn Ave and Avalon, or to use a known confidential source.

For TT5, the affidavit allegedly omitted the ability to utilize Enterprise rental information, probation information, or wage data, and possibly get more from a confidential source.

For TT8, the allegedly omitted information included all of the previous assertions, as well as "critical information" about CS2, the ability to locate Mr. Nelson's rental vehicles using surveillance and CSLI, and the ability to investigate other targets using toll records, CSLI and surveillance.

For TT9, all of the above.

For TT10, again, all of the above.

Defendants have not established the foundation for a *Franks* hearing.  Most of their quarrels with the statements and omissions relate to opinions about the availability of various investigative techniques. As noted at the outset of this opinion, Defendants must do more than speculate and offer their own unsubstantiated opinions in order to be entitled to a hearing.  They have not done enough.

**I.    Sealing**

At present, the recordings for all DEA wiretaps are downloaded to encrypted DVDs at the DEA headquarters in Washington, D.C.  The encrypted disks are then sent via FedEx to the agents, in Hagerstown, Maryland in this case.  At that point, according to the Government, they are impossible to tamper with.  Defendants argue that delays in sealing TT5, TT8, TT9, and TT10 require suppression of evidence.  The first two were not sealed until approximately 10 days after expiration, while the latter two were not sealed until more than six weeks after expiration and were not downloaded for about a week.

The sealing orders themselves, and the memoranda supplied in ECF Nos. 311-8 and 311-9, establish the dates of downloading, dispatch to the agents in Hagerstown, custody before physical transport to the Judge, and sealing.  There does not appear any substantial delay with regard to TT5.  For TT8 and TT9, TFO Mills[7] reports that he was "unable" to meet with Judge Boyer until September 20 and Judge Dwyer until October 29.  He reports taking TT10 to Judge Boyer for sealing on October 31.  He titled the subject of the memos "Late Submission of Non Drug Evidence."

The Government argues that there was substantial compliance, because any delays were not long enough to raise concerns and that

---

[7] The Government advised that TFO Mills passed away before the hearing.  TFO Teets was not called to testify.

at least some portion of the delays was due to logistical difficulty in meeting with the judge.  The court agrees.  The orders and memos establish the system employed to safeguard the integrity of the recordings.  After expiration, the recordings are downloaded to encrypted DVDs, send via commercial shipper to the local authorities, where they are placed in a temporary non-drug locker until they are taken to a judge to be sealed.  After that, the disks are transferred to the non-drug evidence coordinator.

The agents, both in DC and Hagerstown, were aware of the prompt sealing requirement and the paramount need to protect the integrity of the recordings.  There has been no challenge to the assertion that the encrypted DVDs are tamper proof (nor any suggestion that these recordings have been tampered with.)  Still, all steps in the process were documented, even the "lateness" of the evidence submission.  Under the Maryland framework, there has been no showing of prejudice even if the timing violated the immediacy requirement.  Under federal law, there was a satisfactory explanation for the delay.  The agent represented to his superiors that he was "unable" to meet with the two judges more promptly and, in light of the encrypted nature of the disks secured in an evidence locker, that explanation is sufficient and reasonable.

## III. Johnson's motions to suppress, statement and search pursuant to warrant.  (ECF No. 213).

On August 8, 2019, a search warrant was issued for 10090 Mill Run Circle, Apt. 201, Owings Mills, Maryland.  Eric Johnson moves to suppress all evidence obtained in the ensuing search as well as all derivative evidence.  The primary issue ready for resolution is whether the affidavit contained illegally obtained evidence in the form of a warrantless dog sniff.

### A.  Canine Sniff

Two days before the issuance of the warrant, law enforcement brought a K-9 drug detection dog who conducted a "free air scan of the TARGET APARTMENT main entry door."  The dog gave a positive alert for the odor of a controlled dangerous substance.  As part of the evidentiary hearing, Agent Jasen Logsdon testified about the circumstances surrounding that "dog sniff."  Agents visited management and obtained a swipe card to access the locked entry door and permission to access the common areas.  The target apartment was leased to Latrice Campbell, the suspected girlfriend of Eric Johnson.  Agent Logsdon described the large apartment complex, with locked entry doors.  After entering with the canine drug detection team, he and the team took the elevator to the second floor and entered a long hallway.  With photos, a video, and narrative, he described the hallway, and demonstrated how he instructed the canine officer about the area of interest.  The

canine officer told him that the dog alerted to apartment 201.  As
stipulated by the parties, in a report the canine handler described
the positive alert in the area of the lower door seam.  Apartment
201 is near the elevators and occupants of other apartments on
that floor would walk by the door on their way down the hall to
their own apartments.  The small set back is created by the
presence of what appear to be storage closets.  At the time of the
dog sniff, there was nothing in front of the apartment door (no
door mat or other indicia of control by the occupant.)

The defense called Michael McGee who inspected the area
outside the door to apartment 201.  He, too, described the area
and provided measurements.  He said that the door is recessed from
a common hallway by approximately three and a half feet.  Mr. McGee
gained access to the building through two secured doors, by using
the buzzer on the wall to get the property manager or someone else
to answer.  He clarified that the first buzzer provided access to
a person in an office where he explained that he was a private
investigator and wanted to take some photos and measurements.  He
then went to the door to make his measurements, without getting
permission from the tenant in apartment 201

Officer Logsdon gained access to the hallway by consent of
the management of the apartment building.  Such consent is,
apparently, given routinely upon request.  The investigator for
Mr. Johnson, Mr. McGee, also was granted access merely by asking

management.   The area is carpeted and routine cleaning would be expected, with staff frequenting the area regularly. (Information gleaned by a telephone call to the management office was that cleaning was done daily during the week.)  Other tenants use the common hallway and pass by the area going to and from their apartments, although the door to Apartment 201 is recessed a bit because of storage closets adjacent to it.

Based on that evidence, the court finds that the dog sniff was not a violation of the Fourth Amendment.  The area just outside the apartment door is not within the curtilage and the presence there of law enforcement and the dog did not violate any reasonable expectation of privacy.

The defense contends that the area immediately outside of the door to any dwelling constitutes curtilage and is off limits to law enforcement for the purpose of a dog sniff.  It argues that the majority opinion by Justice Scalia in *Florida v. Jardines*, 569 U.S. 1 (2013), left unclear whether a canine sniff outside an apartment door constitutes a search under the Fourth Amendment. By appropriate extension, however, of the concurring opinion, the defense contends that the question can be answered in his favor. The concurring opinion by Justice Kagan relied on *Kyllo v. United States*, 533 U.S. 27, 40 (2001), which had found that "surveillance of the home constitutes a search where the government uses a device that the public does not have access to in order to explore details

of the home that 'would previously have been unknowable without physical intrusion.'"  Justice Kagan concluded that *Kyllo* resolved *Jardines* because a device not in general public use was used to explore details of the home previously unknowable without physical intrusion.

The defense recognizes that the factors described in *United States v. Dunn*, 480 U.S. 294 (1987), help to determine whether an area is within the curtilage.  Those factors are proximity to the home, whether the area is within an enclosure, the nature and uses of the area, and steps taken to protect the area from observation.  From those factors, Mr. Johnson argues that the apartment building is secured, the area in question is immediately outside the apartment home, the area is used to enter and leave the apartment and not by others for socializing, and he locks the apartment door and chose to live in a secured apartment building.  He argues that people shouldn't be treated differently depending on whether they live in a rental unit or an owner-occupied single family home.

Mr. Johnson cites to a Seventh Circuit case, *United States v. Whitaker*, 820 F.3d 849, 854 (7th Cir. 2016), which held that use of a drug-sniffing dog to search a hallway outside a person's apartment invaded that person's reasonable expectation of privacy.

The Government, of course, disagrees and points to the decision by the undersigned in *Seay v. United States*, 15-cv-3367-DKC & 14-cr-0614-DKC, 2018 WL 1583555 (D.Md. April 2, 2018).

There, in the course of rejecting an ineffective assistance of counsel claim, the court found that Mr. Seay could not show that the common hallway of the apartment building was part of the curtilage to his apartment. Here, the Government argues that Mr. Johnson had no property based right outside the apartment door and that, under the *Dunn* factors, his argument fails. The Government asserts that the same analysis applies regardless of the income level of the resident.

Ironically, perhaps the best evidence that the police did not enter the curtilage is the testimony from the defense investigator. He merely asked the management personnel to let him in so he could take measurements in the hallway and they did. Entrance was not restricted to residents in any way despite the locks on the front door. He went right up to the apartment door, probably even closer than the canine team went, to use a measuring tape to determine the width of the door.

While caselaw is still developing, the "majority approach continues to reject the notion that common areas of multiunit dwellings are curtilage." Stephen Grego, State v. Edstrom: No Warrant Needed for Minnesota Police to Conduct a Dog Sniff Outside Your Apartment, 16 U.St. Thomas L.J. 297, 327 (2020).

Nor did the canine sniff violate a reasonable expectation of privacy. Albeit in an unpublished per curiam opinion, the Fourth

Circuit has concluded, post *Jardines*, that a canine sniff in a hotel hallway:

> did not infringe upon a reasonable expectation of privacy. "The use of a well-trained narcotics-detection dog—one that 'does not expose noncontraband items that otherwise would remain hidden from public view—during a lawful traffic stop, generally does not implicate legitimate privacy interests.'" *Illinois v. Caballes*, 543 U.S. 405, 409, 125 S.Ct. 834, 160 L.Ed.2d 842 (2005) (internal quotation marks and citation omitted). Moreover, "[t]he legitimate expectation that information about perfectly lawful activity will remain private is categorically distinguishable from [a person's] hopes or expectations concerning the nondetection of contraband." *Id.* at 410, 125 S.Ct. 834. Because the drug-detecting dog disclosed only the presence of illegal narcotics, we find that the dog-sniff did not violate Legall's legitimate expectation of privacy.

*United States v. Legall*, 585 F.App'x 4, 6 (4ᵗʰ Cir. 2014).

### B.  Statements

Eric Johnson also moves to suppress any statements made during a brief custodial interrogation on August 12, 2019.  The court heard testimony about the entry into the apartment and contact with Mr. Johnson as it might affect the admissibility of any statement he made.  Based on that evidence, the court finds that the alleged statement by Mr. Johnson was made after *Miranda* warnings were given orally and he indicated that he understood. While it was early in the morning, and he had been awakened by the forced and unannounced entry into his apartment, Mr. Johnson

appeared awake, and alert, in the body worn camera video.  After the entry, the situation was calm, Mr. Johnson followed directions of the police, and was seated for some time before the entry team left and the investigators arrived.  Any statement was made voluntarily.  The motion to suppress (ECF No. 212) will be denied.

**IV.  ECF No. 390, motion to suppress by Coleman-Fuller, denied as moot.**

Counsel stated in court on March 14 that the Government would not be using any statements.  Accordingly, the motion will be denied as moot.

**V.  Conclusion**

For the foregoing reasons, the motions to suppress the wiretap evidence will be denied, as will the motions of Eric Johnson and Jarvis Coleman-Fuller discussed above.  The remaining motions will be discussed at the forthcoming hearing.

Date: July 6, 2022                    /s/
                              DEBORAH K. CHASANOW
                              United States District Judge